## MICHIGAN *v.* DeFILLIPPO

No. 77–1680.   Argued February 21, 1979—Decided June 25, 1979

BURGER, C. J., delivered the opinion of the Court, in which STEWART, WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. BLACKMUN, J., filed a concurring opinion, *post,* p. 40. BRENNAN, J., filed a dissenting opinion, in which MARSHALL and STEVENS, JJ., joined, *post,* p. 41.

*Timothy A. Baughman* argued the cause for petitioner. With him on the briefs was *William L. Cahalan.*

*James C. Howarth,* by appointment of the Court, 439 U. S. 976, argued the cause and filed a brief for respondent.*

---

*Briefs of *amici curiae* urging reversal were filed by *Frank Carrington, Wayne W. Schmidt, Glen R. Murphy, Thomas Hendrickson, James P. Costello,* and *Richard F. Mayer* for Americans for Effective Law Enforcement, Inc., et al.; and by *Evelle J. Younger,* Attorney General, *Jack R. Winkler,* Chief Assistant Attorney General, *Daniel J. Kremer,* Assistant Attorney General, and *Harley D. Mayfield* and *Karl Phaler,* Deputy Attorneys General, for the State of California.

Briefs of *amici curiae* urging affirmance were filed by *Edward M. Wise* for the American Civil Liberties Union Fund of Michigan; and by *John J. Cleary* for California Attorneys for Criminal Justice et al.

*Laurance S. Smith* filed a brief for the National Legal Aid and Defender Association as *amicus curiae.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

The question presented by this case is whether an arrest made in good-faith reliance on an ordinance, which at the time had not been declared unconstitutional, is valid regardless of a subsequent judicial determination of its unconstitutionality.

I

At approximately 10 p. m. on September 14, 1976, Detroit police officers on duty in a patrol car received a radio call to investigate two persons reportedly appearing to be intoxicated in an alley. When they arrived at the alley, they found respondent and a young woman. The woman was in the process of lowering her slacks. One of the officers asked what they were doing, and the woman replied that she was about to relieve herself. The officer then asked respondent for identification; respondent asserted that he was Sergeant Mash, of the Detroit Police Department; he also purported to give his badge number, but the officer was unable to hear it. When respondent again was asked for identification, he changed his answer and said either that he worked for or that he knew Sergeant Mash. Respondent did not appear to be intoxicated.

Section 39–1–52.3 of the Code of the City of Detroit provides that a police officer may stop and question an individual if he has reasonable cause to believe that the individual's behavior warrants further investigation for criminal activity. In 1976 the Detroit Common Council amended § 39–1–52.3 to provide that it should be unlawful for any person stopped pursuant thereto to refuse to identify himself and produce evidence of his identity.[1]

_____

[1] As amended, Code of the City of Detroit § 39–1–52.3 provided:

"When a police officer has reasonable cause to believe that the behavior of an individual warrants further investigation for criminal activity, the

When he failed to identify himself, respondent was taken into custody for violation of § 39–1–52.3; [2] he was searched by one of the officers who found a package of marihuana in one of respondent's shirt pockets, and a tinfoil packet secreted inside a cigarette package in the other. The tinfoil packet subsequently was opened at the station; an analysis established that it contained phencyclidine, another controlled substance.

Respondent was charged with possession of the controlled substance phencyclidine. At the preliminary examination, he moved to suppress the evidence obtained in the search following the arrest; the trial court denied the motion. The Michigan Court of Appeals allowed an interlocutory appeal and reversed. It held that the Detroit ordinance, § 39–1–52.3, was unconstitutionally vague and concluded that since respondent had been arrested pursuant to that, ordinance, both the arrest and the search were invalid.

The court expressly rejected the contention that an arrest made in good-faith reliance on a presumptively valid ordinance is valid regardless of whether the ordinance subsequently is declared unconstitutional. Accordingly, the Michigan Court of Appeals remanded with instructions to suppress the evi-

---

officer may stop and question such person. It shall be unlawful for any person stopped pursuant to this section to refuse to identify himself, and to produce verifiable documents or other evidence of such identification. In the event that such person is unable to provide reasonable evidence of his true identity, the police officer may transport him to the nearest precinct in order to ascertain his identity."

While holding the ordinance unconstitutional, the Michigan Court of Appeals construed the ordinance to make refusal to identify oneself a crime meriting arrest. 80 Mich. App. 197, 201 n. 1, 262 N. W. 2d 921, 923 n. 1 (1977).

The preamble to the amendment indicates that it was enacted in response to an emergency caused by a marked increase in crime, particularly street crime by gangs of juveniles.

[2] The woman was arrested on a charge of disorderly conduct; she is not involved in this case.

dence and quash the information. 80 Mich. App. 197, 262 N. W. 2d 921 (1977).

The Michigan Supreme Court denied leave to appeal. We granted certiorari, 439 U. S. 816 (1978), to review the Michigan court's holding that evidence should be suppressed on federal constitutional grounds, although it was obtained as a result of an arrest pursuant to a presumptively valid ordinance. That holding was contrary to the holdings of the United States Court of Appeals for the Fifth Circuit that such arrests are valid. See *United States* v. *Carden,* 529 F. 2d 443 (1976); *United States* v. *Kilgen,* 445 F. 2d 287 (1971).

## II

Respondent was not charged with or tried for violation of the Detroit ordinance. The State contends that because of the violation of the ordinance, *i. e.,* refusal to identify himself, which respondent committed in the presence of the officers, respondent was subject to a valid arrest. The search that followed being incidental to that arrest, the State argues that it was equally valid and the drugs found should not have been suppressed. Respondent contends that since the ordinance which he was arrested for violating has been found unconstitutionally vague on its face, the arrest and search were invalid as violative of his rights under the Fourth and Fourteenth Amendments. Accordingly, he contends the drugs found in the search were correctly suppressed.

Under the Fourth and Fourteenth Amendments, an arresting officer may, without a warrant, search a person validly arrested. *United States* v. *Robinson,* 414 U. S. 218 (1973); *Gustafson* v. *Florida,* 414 U. S. 260 (1973). The constitutionality of a search incident to an arrest does not depend on whether there is any indication that the person arrested possesses weapons or evidence. The fact of a lawful arrest, standing alone, authorizes a search. *United States* v. *Robinson, supra,* at 235. Here the officer effected the arrest of respond-

ent for his refusal to identify himself; contraband drugs were found as a result of the search of respondent's person incidental to that arrest. If the arrest was valid when made, the search was valid and the illegal drugs are admissible in evidence.

Whether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law. *Ker* v. *California,* 374 U. S. 23, 37 (1963); *Johnson* v. *United States,* 333 U. S. 10, 15, and n. 5 (1948). Respondent does not contend, however, that the arrest was not authorized by Michigan law. See Mich. Comp. Laws § 764.15 (1970). His sole contention is that since the arrest was for allegedly violating a Detroit ordinance later held unconstitutional, the search was likewise invalid.

### III

It is not disputed that the Constitution permits an officer to arrest a suspect without a warrant if there is probable cause to believe that the suspect has committed or is committing an offense. *Adams* v. *Williams,* 407 U. S. 143, 148–149 (1972); *Beck* v. *Ohio,* 379 U. S. 89, 91 (1964). The validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest. We have made clear that the kinds and degree of proof and the procedural requirements necessary for a conviction are not prerequisites to a valid arrest. See *Gerstein* v. *Pugh,* 420 U. S. 103, 119–123 (1975); *Brinegar* v. *United States,* 338 U. S. 160, 174–176 (1949).

When the officer arrested respondent, he had abundant probable cause to believe that respondent's conduct violated the terms of the ordinance. The ordinance provides that a person commits an offense if (a) an officer has reasonable cause to believe that given behavior warrants further investigation, (b) the officer stops him, and (c) the suspect refuses to identify himself. The offense is then complete.

Respondent's presence with a woman, in the circumstances described, in an alley at 10 p. m. was clearly, in the words of the ordinance, "behavior . . . warrant[ing] further investigation." Respondent's inconsistent and evasive responses to the officer's request that he identify himself, stating first that he was Sergeant Mash of the Detroit Police Department and then that he worked for or knew Sergeant Mash, constituted a refusal by respondent to identify himself as the ordinance required. Assuming, *arguendo,* that a person may not constitutionally be required to answer questions put by an officer in some circumstances, the false identification violated the plain language of the Detroit ordinance.

The remaining question, then, is whether, in these circumstances, it can be said that the officer lacked probable cause to believe that the conduct he observed and the words spoken constituted a violation of law simply because he should have known the ordinance was invalid and would be judicially declared unconstitutional. The answer is clearly negative.

This Court repeatedly has explained that "probable cause" to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense. See *Gerstein* v. *Pugh, supra,* at 111; *Adams* v. *Williams, supra,* at 148; *Beck* v. *Ohio, supra,* at 91; *Draper* v. *United States,* 358 U. S. 307, 313 (1959); *Brinegar* v. *United States, supra,* at 175–176; *Carroll* v. *United States,* 267 U. S. 132, 162 (1925).

On this record there was abundant probable cause to satisfy the constitutional prerequisite for an arrest. At that time, of course, there was no controlling precedent that this ordinance was or was not constitutional, and hence the conduct observed violated a presumptively valid ordinance. A prudent officer, in the course of determining whether respondent had committed an offense under all the circumstances shown

by this record, should not have been required to anticipate that a court would later hold the ordinance unconstitutional.

Police are charged to enforce laws until and unless they are declared unconstitutional. The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality—with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws. Society would be ill-served if its police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement.

In *Pierson* v. *Ray,* 386 U. S. 547 (1967), persons who had been arrested for violating a statute later declared unconstitutional by this Court sought damages for false arrest under state law and for violation of the Fourteenth Amendment under 42 U. S. C. § 1983. Mr. Chief Justice Warren speaking for the Court, in holding that police action based on a presumptively valid law was subject to a valid defense of good faith, observed: "A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does." 386 U. S., at 555. The Court held that "the defense of good faith and probable cause, which the Court of Appeals found available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under § 1983." *Id.,* at 557. Here, the police were not required to risk "being charged with dereliction of duty if [they did] not arrest when [they had] probable cause" on the basis of the conduct observed.[3]

---

[3] The purpose of the exclusionary rule is to deter unlawful police action. No conceivable purpose of deterrence would be served by suppressing evidence which, at the time it was found on the person of the respondent, was the product of a lawful arrest and a lawful search. To deter police from enforcing a presumptively valid statute was never remotely in the contemplation of even the most zealous advocate of the exclusionary rule.

## IV

We have held that the exclusionary rule required suppression of evidence obtained in searches carried out pursuant to statutes, not previously declared unconstitutional, which purported to authorize the searches in question without probable cause and without a valid warrant. See, *e. g., Torres* v. *Puerto Rico,* 442 U. S. 465 (1979); *Almeida-Sanchez* v. *United States,* 413 U. S. 266 (1973); *Sibron* v. *New York,* 392 U. S. 40 (1968); *Berger* v. *New York,* 388 U. S. 41 (1967). Our holding today is not inconsistent with these decisions; the statutes involved in those cases bore a different relationship to the challenged searches than did the Detroit ordinance to respondent's arrest and search.

Those decisions involved statutes which, by their own terms, authorized searches under circumstances which did not satisfy the traditional warrant and probable-cause requirements of the Fourth Amendment. For example, in *Almeida-Sanchez* v. *United States, supra,* we held invalid a search pursuant to a federal statute which authorized the Border Patrol to search any vehicle within a "reasonable distance" of the border, without a warrant or probable cause. The Attorney General, by regulation, fixed 100 miles as a "reasonable distance" from the border. 413 U. S., at 268. We held a search so distant from the point of entry was unreasonable under the Constitution. In *Berger* v. *New York* we struck down a statute authorizing searches under warrants which did not "particularly describ[e] the place to be searched, and the persons or things to be seized," as required by the Fourth and Fourteenth Amendments. 388 U. S., at 55–56.

In contrast, the ordinance here declared it a misdemeanor for one stopped for "investigation" to "refuse to identify himself"; it did not directly authorize the arrest or search.[4] Once

---

[4] In terms of the ordinance, § 39–1–52.3 authorizes officers to detain an individual who is "unable to provide reasonable evidence of his true identity." However, the State disclaims reliance on this provision to

respondent refused to identify himself as the presumptively valid ordinance required, the officer had probable cause to believe respondent was committing an offense in his presence, and Michigan's general arrest statute, Mich. Comp. Laws § 764.15 (1970), authorized the arrest of respondent, independent of the ordinance. The search which followed was valid because it was incidental to that arrest. The ordinance is relevant to the validity of the arrest and search only as it pertains to the "facts and circumstances" we hold constituted probable cause for arrest.

The subsequently determined invalidity of the Detroit ordinance on vagueness grounds does not undermine the validity of the arrest made for violation of that ordinance, and the evidence discovered in the search of respondent should not have been suppressed. Accordingly, the case is remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE BLACKMUN, concurring.

I join the Court's opinion, but add a few words about the concern so evident in MR. JUSTICE BRENNAN's dissenting opinion that today's decision will allow States and municipalities to circumvent the probable-cause requirement of the Fourth Amendment. There is some danger, I acknowledge, that the police will use a stop-and-identify ordinance to arrest persons for improper identification; that they will then conduct a search pursuant to the arrest; that if they discover contraband or other evidence of crime, the arrestee will be charged with some other offense; and that if they do not discover contraband or other evidence of crime, the arrestee will be released. In this manner, if the arrest for violation of the stop-

---

authorize the arrest of a person who, like respondent, "refuse[s] to identify himself." Tr. of Oral Arg. 5.

and-identify ordinance is not open to challenge, the ordinance itself could perpetually evade constitutional review.

There is no evidence in this case, however, that the Detroit ordinance is being used in such a pretextual manner. See Tr. of Oral Arg. 8. If a defendant in a proper case showed that the police habitually arrest, but do not prosecute, under a stop-and-identify ordinance, then I think this would suffice to rebut any claim that the police were acting in reasonable, good-faith reliance on the constitutionality of the ordinance. The arrestee could then challenge the validity of the ordinance, and, if the court concluded it was unconstitutional, could have the evidence obtained in the search incident to the arrest suppressed.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL and MR. JUSTICE STEVENS join, dissenting.

I disagree with the Court's conclusion that the Detroit police had constitutional authority to arrest and search respondent because respondent refused to identify himself in violation of the Detroit ordinance. In my view, the police conduct, whether or not authorized by state law, exceeded the bounds set by the Constitution and violated respondent's Fourth Amendment rights.

At the time of respondent's arrest, Detroit City Code § 39–1–52.3 (1976) read as follows:

"When a police officer has reasonable cause to believe that the behavior of an individual warrants further investigation for criminal activity, the officer may stop and question such person. It shall be unlawful for any person stopped pursuant to this section to refuse to identify himself, and to produce verifiable documents or other evidence of such identification. In the event that such person is unable to provide reasonable evidence of his true identity, the police officer may transport him to the nearest precinct in order to ascertain his identity."

Detroit police, acting purely on suspicion, stopped respondent Gary DeFillippo on the authority of this ordinance and demanded that he identify himself and furnish proof of his identity. When respondent rebuffed their inquiries the police arrested him for violation of the ordinance. Thereafter, police searched respondent and discovered drugs.

Respondent challenges the constitutionality of the ordinance and his arrest and search pursuant to it. The Court assumes the unconstitutionality of the ordinance but upholds respondent's arrest nonetheless. The Court reasons that the police had probable cause to believe that respondent's actions violated the ordinance, that the police could not have been expected to know that the ordinance was unconstitutional, and that the police actions were therefore reasonable.

The Court errs, in my view, in focusing on the good faith of the arresting officers and on whether they were entitled to rely upon the validity of the Detroit ordinance. For the dispute in this case is not between the arresting officers and respondent. Cf. *Pierson* v. *Ray*, 386 U. S. 547 (1967).[1] The dispute is between respondent and the State of Michigan.

---

[1] The Court's reliance upon *Pierson* v. *Ray*, 386 U. S., at 555, exposes the fallacy of its constitutional analysis. The Court assumes that respondent had a constitutional right to refuse to answer the questions put to him by the police, see *ante*, at 37, but nonetheless, relying upon *Pierson* v. *Ray*, upholds respondent's arrest and search for exercising this constitutional right. But *Pierson* involved an action for damages against individual police officers and held only that it would be unfair to penalize those officers for actions undertaken in a good-faith, though mistaken, interpretation of the Constitution. Since the officer who arrested respondent in this case is not being mulcted for damages or penalized in any way for his actions, *Pierson* does not support the Court's position. Rather, since respondent is the one who is being penalized for the exercise of what he reasonably believed to be his constitutional rights, *Pierson* counsels for invalidation of respondent's arrest and not for its validation. For if it is unfair to penalize a police officer for actions undertaken pursuant to a good-faith, though mistaken, interpretation of the Constitution, then surely it is unfair to penalize respondent for actions undertaken pursuant to a good-faith and *correct* interpretation of the Constitution.

The ultimate issue is whether the State gathered evidence against respondent through unconstitutional means. Since the State is responsible for the actions of its legislative bodies as well as for the actions of its police, the State can hardly defend against this charge of unconstitutional conduct by arguing that the constitutional defect was the product of legislative action and that the police were merely executing the laws in good faith. See *Torres* v. *Puerto Rico,* 442 U. S. 465 (1979); *Almeida-Sanchez* v. *United States,* 413 U. S. 266 (1973); *Berger* v. *New York,* 388 U. S. 41 (1967). States "may not . . . authorize police conduct which trenches upon Fourth Amendment rights, regardless of the labels which it attaches to such conduct. The question in this Court upon review of a state-approved search or seizure 'is not whether the search [or seizure] was authorized by state law. The question is rather whether the search [or seizure] was reasonable under the Fourth Amendment.'" *Sibron* v. *New York,* 392 U. S. 40, 61 (1968), quoting in part from *Cooper* v. *California,* 386 U. S. 58, 61 (1967).

If the Court's inquiry were so directed and had not asked whether the arresting officers faithfully applied state law, invalidation of respondent's arrest and search would have been inescapable. For the Court's assumption that the Detroit ordinance is unconstitutional is well founded; the ordinance is indeed unconstitutional and patently so. And if the reasons for that constitutional infirmity had only been explored, rather than simply assumed, it would have been obvious that the application of the ordinance to respondent by Detroit police in this case trenched upon respondent's Fourth Amendment rights and resulted in an unreasonable search and seizure.

The touchstone of the Fourth Amendment's protection of privacy interests and prohibition against unreasonable police searches and seizures is the requirement that such police intrusions be based upon probable cause—" 'the best compromise that has been found for accommodating [the] often

opposing interests' in 'safeguard[ing] citizens from rash and unreasonable interferences with privacy' and in 'seek[ing] to give fair leeway for enforcing the law in the community's protection.'" *Dunaway* v. *New York,* 442 U. S. 200, 208 (1979), quoting from *Brinegar* v. *United States,* 338 U. S. 160, 176 (1949).

Because of this requirement and the constitutional policies underlying it, the authority of police to accost citizens on the basis of suspicion is "narrowly drawn," *Terry* v. *Ohio,* 392 U. S. 1, 27 (1968), and carefully circumscribed. See *Dunaway* v. *New York, supra.* Police may not conduct searches when acting on less than probable cause. Even weapons frisks in these circumstances are permissible only if the police have reason to believe that they are dealing with an armed and dangerous individual. See *Terry* v. *Ohio, supra,* at 24. Furthermore, while a person may be briefly detained against his will on the basis of reasonable suspicion "while pertinent questions are directed to him . . . the person stopped is not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest . . . ." *Terry* v. *Ohio, supra,* at 34 (WHITE, J., concurring). In the context of criminal investigation, the privacy interest in remaining silent simply cannot be overcome at the whim of any suspicious police officer.[2] "[W]hile the police have the right to request citizens to answer voluntarily questions concerning unsolved crimes they have no right to compel them to an-

---

[2] In addition to the Fourth Amendment, see *Katz* v. *United States,* 389 U. S. 347 (1967), the right to remain silent when detained by police on the basis of suspicion may find its source in the Fifth Amendment's privilege against self-incrimination, see *Haynes* v. *United States,* 390 U. S. 85 (1968); *Grosso* v. *United States,* 390 U. S. 62 (1968); *Albertson* v. *SACB,* 382 U. S. 70 (1965), or, more generally, in "the right to be let alone—the most comprehensive of rights and the right most valued by civilized men." *Olmstead* v. *United States,* 277 U. S. 438, 478 (1928) (Brandeis, J., dissenting). See also *Griswold* v. *Connecticut,* 381 U. S. 479, 494 (1965) (Goldberg, J., concurring).

swer." *Davis* v. *Mississippi,* 394 U. S. 721, 727 n. 6 (1969).

In sum then, individuals accosted by police on the basis merely of reasonable suspicion have a right not to be searched, a right to remain silent, and, as a corollary, a right not to be searched if they choose to remain silent.

It is plain that the Detroit ordinance and the police conduct that it purports to authorize abridge these rights and their concomitant limitations upon police authority. The ordinance authorizes police, acting on the basis of suspicion, to demand answers from suspects and authorizes arrest, search, and conviction for those who refuse to comply. The ordinance therefore commands that which the Constitution denies the State power to command and makes "a crime out of what under the Constitution cannot be a crime." *Coates* v. *Cincinnati,* 402 U. S. 611, 616 (1971). Furthermore, the ordinance, by means of a transparent expedient—making the constitutionally protected refusal to answer itself a substantive offense—sanctions circumvention by the police of the Court's holding that refusal to answer police inquiries during a *Terry* stop furnishes no basis for a full-scale search and seizure. Clearly, this is a sheer piece of legislative legerdemain not to be countenanced. See *Davis* v. *Mississippi, supra,* at 726–727; *Sibron* v. *New York, supra.*

The Court does not dispute this analysis. Rather, it assumes that respondent had a constitutional right to refuse to cooperate with the police inquiries, that the ordinance is unconstitutional, and that henceforward the ordinance shall be regarded as null and void. Yet, the Court holds that arrests and searches pursuant to the ordinance prior to its invalidation by the Michigan Court of Appeals are constitutionally valid. Given the Court's assumptions concerning the invalidity of the ordinance, its conclusion must rest on the tacit assumption that the defects requiring invalidation of the ordinance and of convictions entered pursuant to it do not also require the invalidation of arrests pursuant to the ordinance. But only a brief reflection upon the pervasiveness of the ordi-

nance's constitutional infirmities demonstrates the fallacy of that assumption.

A major constitutional defect of the ordinance is that it forces individuals accosted by police solely on the basis of suspicion to choose between forgoing their right to remain silent and forgoing their right not to be searched if they choose to remain silent. Clearly, a constitutional prohibition merely against prosecutions under the ordinance and not against arrests under the ordinance as well would not solve this dilemma. For the fact would remain that individuals who chose to remain silent would be forced to relinquish their right not to be searched (and indeed would risk conviction on the basis of any evidence seized from them), while those who chose not to be searched would be forced to forgo their constitutional right to remain silent. This Hobson's choice can be avoided only by invalidating such police intrusions whether or not authorized by ordinance and holding fast to the rule of *Terry* and its progeny: that police acting on less than probable cause may not search, compel answers, or search those who refuse to answer their questions.[3]

The conduct of Detroit police in this case plainly violated Fourth Amendment limitations. The police commanded respondent to relinquish his constitutional right to remain silent and then arrested and searched him when he refused to do so. The Detroit ordinance does not validate that constitutionally impermissible conduct. Accordingly, I would affirm the judgment of the Michigan Court of Appeals invalidating respondent's arrest and suppressing its fruits.

---

[3] There is also the risk that if stop-and-identify ordinances cannot be challenged in collateral proceedings they may never be presented for judicial review. Jurisdictions so minded may avoid prosecuting under them and use them merely as investigative tools to gather evidence of other crimes through pretextual arrests and searches. The possibility of such evasion is yet another reason that demonstrates the constitutional error of the Court's approval of respondent's arrest.